**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| JONI REEVES, | ) | CASE NO. 5:17CV2686 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

Plaintiff, Joni Reeves ("Plaintiff" or "Reeves"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying her application for a Period of Disability ("POD") and Disability Insurance Benefits

("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.*

("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the

parties, pursuant to 28 U.S.C. § 636(c)(2). For the reasons set forth below, the Commissioner's

final decision is AFFIRMED.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

# I. PROCEDURAL HISTORY

In February 2015, Reeves filed an application for POD and DIB, alleging a disability onset date of September 27, 2013 and claiming she was disabled due to narcolepsy, muscle weakness, depression, and hypothyroidism. (Transcript ("Tr.") at 11, 151, 186.) The applications were denied initially and upon reconsideration, and Reeves requested a hearing before an administrative law judge ("ALJ"). (Tr. 11, 104-112, 114.)

On January 12, 2017, an ALJ held a hearing, during which Reeves, represented by counsel, and an impartial vocational expert ("VE") testified. (Tr. 23-71.) On February 23, 2017, the ALJ issued a written decision finding Reeves was not disabled. (Tr. 11-22.) The ALJ's decision became final on November 15, 2017, when the Appeals Council declined further review. (Tr. 1-5.)

On December 26, 2017, Reeves filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 12, 13.) Reeves asserts the following assignments of error:

(1)     The ALJ did not properly evaluate and weigh the opinion of Plaintiff's treating physician in that she failed to provide good reasons for assigning less than controlling weight or great weight to the doctor's opinion and therefore violated the treating physician rule.

(2)     The ALJ failed to adequately evaluate the Plaintiff's narcolepsy under the Listing of Impairments.

(Doc. No. 12.)

# II. EVIDENCE

## A. Personal and Vocational Evidence

Reeves was born in July 1963 and was fifty-three (53) years-old at the time of her administrative hearing, making her a "person closely approaching advanced age" under social security regulations. (Tr. 17.) *See* 20 C.F.R. §§ 404.1563(d) & 416.963(d). She has at least a high school education and is able to communicate in English. (*Id.*) She has past relevant work as a registered nurse and coding specialist. (Tr. 16.)

**B.      Relevant Medical Evidence[2]**

On June 28, 2011, Reeves presented to John T. Given, M.D., for evaluation of her sleep issues. (Tr. 299-301.) She reported a 24 year history of sleep disturbance and restless leg syndrome and indicated her sleep problems "seem to be getting worse." (Tr. 299.) Reeves complained of difficulty initiating and maintaining sleep, daytime sleepiness (including while driving), restless leg, frequent urination, and constantly wanting to nap. (Tr. 300.) Examination findings were largely normal, including normal cranial nerves, strength, and gait. (*Id.*) Dr. Given found Reeves had severe sleep disturbance and sleep apnea; "intensified" her medications; and ordered sleep studies and blood work. (Tr. 301.) Reeves underwent a polysomnogram on August 2, 2011, which revealed severely reduced REM sleep, severe periodic leg movement, severe fragmentation of sleep, obstructive respiratory events, and an elevated number of spontaneous arousals. (Tr. 295, 297.)

On June 25, 2012, Reeves underwent another overnight polysomnogram. (Tr. 230-236.) This study showed "obstructive sleep apnea [that] is minimal with REM-related [obstructive sleep apnea] that is moderate," severe fragmentation of sleep, reduced REM onset latency,

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

obstructive respiratory events, increased leg movements, an elevated number of spontaneous arousals, and difficulty initiating and maintaining sleep.  (Tr. 234, 291.)  Dr. Given ordered a Multiple Sleep Latency Test ("MSLT") to evaluate Reeves for narcolepsy.  (Tr. 291.)  Reeves underwent the MSLT the next day, which revealed excessive daytime sleepiness.  (Tr. 237.)

Reeves returned to Dr. Given on September 13, 2013.  (Tr. 245-248.)  Dr. Given confirmed a diagnosis of narcolepsy based on the sleep studies noted above.  (Tr. 245.)  Reeves continued to report fatigue, daytime sleepiness, and "always wanting to nap."  (*Id.*)  She did report some improvement, however, noting she was getting 7 ½ hours of sleep per night with Xanax.  (*Id.*)  Reeves indicated she wakes up three times per night but stated "I'm ok with how my sleep is."  (*Id.*)  On examination, Dr. Given noted normal cranial nerves and normal affect.  (Tr. 246.)  He remarked that Reeves' "eyes were more open throughout most of the exam today; she yawned less frequently today than previous."  (*Id.*)  Dr. Given diagnosed narcolepsy with cataplexy and noted "initial improvement with Concerta." (Tr. 245, 247.)  He advised Reeves to continue Concerta, and prescribed Adderall and a trial of Vyvanse.  (Tr. 247.)  Finally, Dr. Given noted "we have to 'make the best' of a situation that is far from ideal," and emphasized proper sleep hygiene and maintaining a sleep schedule.  (*Id.*)

On September 25, 2013, Reeves continued to complaint of persistent fatigue and daytime sleepiness.  (Tr. 249.)  She reported she was improving but indicated "it has been a struggle." (*Id.*)  Reeves indicated she had turned in her resignation at work, and Dr. Given noted "we will be TOTALLY supportive in this period re disability and . . . vocational rehab."  (*Id.*)  On examination, Dr. Given noted normal cranial nerves and a lethargic and sleepy affect.  (Tr. 250.)

He indicated Reeves' eyes were more open but she "yawned constantly throughout the entire exam." (*Id.*) Dr. Given continued Reeves on Concerta, Adderall, and Vyvanse. (Tr. 251.)

Reeves returned to Dr. Given on October 4, 2013. (Tr. 253-256.) She was optimistic due to improvement of her fatigue and daytime sleepiness with the use of Vyvanse. (Tr. 253.) Examination findings were the same as her previous visit. (Tr. 255.) Dr. Given continued her on Concerta and Vyvanse and again emphasized maintaining a proper sleep schedule and sleep hygiene. (*Id.*) One week later, on October 11, 2013, Reeves indicated Adderall was the "best thing" for her. (Tr. 257.) Dr. Given adjusted Reeves' medications, prescribing Adderall and Alprazolam. (Tr. 259.)

On November 13, 2013, Reeves presented to Dr. Given, stating "I feel so much better on the short acting Adderall since I'm back on that medication." (Tr. 261-264.) Examination findings were normal, including normal cranial nerves and normal affect. (Tr. 263.) Dr. Given continued Reeves on her medications. (*Id.*)

The record reflects Reeves presented to Dr. Given and/or Dr. Given's Certified Nurse Practitioner Jennifer Moyer, C.N.P., on eleven (11) occasions in 2014. (Tr. 265-281, 303-319.) On January 20, 2014, Reeves reported significant family stressors and continued fatigue and excessive daytime sleepiness. (Tr. 265.) However, she indicated her narcolepsy was under "better control" with Adderall and physical examination findings were largely normal, including normal cranial nerves and affect. (Tr. 267.) Physical examination findings were again normal on February 25, 2014, and Reeves was continued on her medications. (Tr. 269-271.) On March 26, 2014 and May 2, 2014, Reeves indicated her narcolepsy was under "better control" and her sleep was improved on medication. (Tr. 272, 275-276.) Reeves has a minor rhinitis flare in May

2014, however, a sinus x-ray was negative. (Tr. 275-277.) Reeves was prescribed a "burst and taper" of Prednisone. (Tr. 277.)

In June and July 2014, Reeves again reported better control of her narcolepsy and improved sleep with medication. (Tr. 303, 306-307.) Examination findings on both dates were normal, including normal cranial nerves and affect. (Tr. 304, 308.) On August 27, 2014, Reeves indicated her sleep issues were "satisfactorily improved" and her narcolepsy was "controlled" with medication. (Tr. 309.) Examination revealed normal cranial nerves, normal strength, normal gait, and normal affect. (*Id.*) In September 2014, Reeves continued to report persistent family stressors, but her narcolepsy was under "better control" and her sleep was improved with medication. (Tr. 311.) Treatment notes dated November 3, 2014 and December 1, 2014 reflect Reeves' narcolepsy was "improved" and her sleep was "stable." (Tr. 314, 317.) Physical examination findings on both dates were normal. (Tr. 315, 318.)

The record reflects Reeves continued to present regularly to Dr. Given in 2015, seeing him on at least fifteen (15) occasions. On January 2, 2015, Reeves reported her narcolepsy and daytime sleepiness were improved with Adderall, and indicated she was sleeping 6 hours per night with Xanax. (Tr. 320.) Examination findings were normal, with the exception of a flat affect. (Tr. 321.) On January 29, 2015, Reeves' narcolepsy was described as improved and her sleep as "stable with Xanax." (Tr. 323.) Examination findings were again normal. (Tr. 324.)

On February 18, 2015, Reeves reported that she "continues not to sleep well with taking Xanax." (Tr. 287.) On examination, Dr. Given noted a depressed and "spaced out" affect. (Tr. 288.) He assessed depression, narcolepsy with cataplexy, excessive daytime sleepiness, sleep apnea, and hypothyroidism; continued Reeves on her medications and prescribed Effexor. (*Id.*)

He also noted that "at present, her impairment of cognition is at a level that prevents her from being successful at a job." (*Id.*) On that same date, Dr. Given wrote a letter to Stark County Job & Family Services, stating as follows:

> I have known Ms. Joni Reeves for several years. A medical condition, Narcolepsy, was responding positively to treatment with daytime stimulants and sleep management. Unemployment [and family stressors] have exacerbated her symptoms of impaired concentration and medicines alone are not sufficient.
>
> At present her impairment of cognition is at a level that prevents her from successfully completing the paperwork and electronic forms to qualify for much needed social and financial assistance.
>
> She is basically a 'good person' with above average intelligence who is in great need of temporary financial help, counseling and practical guidance to train for re-entry into the work force. Although she is in a pathetic state and nearly helpless at the present time, she has a very good chance of returning to full employment and self-sufficiency. On the other side, without help, I fear further deterioration, marginalization, and eventual collapse.

(Tr. 286.)

On March 4, 2015, Dr. Given completed a Residual Functional Capacity Questionnaire regarding Reeves' impairments. (Tr. 284-285.) He indicated a diagnosis of narcolepsy with cataplexy and indicated that the severity of this condition met the criteria for non-convulsive epilepsy. (*Id.*) Dr. Given explained this conclusion as follows:

> Sleep test (MSLT) confirms Narcolepsy diagnosis. Excessive daytime sleepiness and episodes of uncontrolled muscular weakness without seizure activity or loss of consciousness. Not responsive to Xyrem, partially responsive to Adderall and daytime stimulants. The severity definitely impairs her ability to focus and concentrate sufficiently to complete tasks which are within her previous cognitive range. Condition definitely impairs [activities of daily living] and disables her from gainful employment.

(*Id.*) Dr. Given concluded Reeves was likely to be absent from work more than four days per month as a result of her impairments or treatment. (Tr. 285.) He further opined Reeves'

condition would severely affect her concentration, persistence, or pace at work for more than 20% of the workday. (*Id*.)

On March 25, 2015, April 24, 2015, and May 22, 2015, Reeves reported her narcolepsy was under "better control" with Adderall, and her sleep was improved with medication. (Tr. 334-335, 400-401, 404-405.) On each of these occasions, examination findings were largely normal, including normal cranial nerves and normal affect. (Tr. 336, 402, 405-406.)

On May 22, 2015, Reeves completed a Fatigue Severity Scale ("FSS") and Epworth Sleepiness Scale ("ESS"). (Tr. 412-413.) In the FSS, she reported that "a lot of activities bring about or affect fatigue." (Tr. 412.) Reeves also indicated: (1) she is easily fatigued, (2) fatigue interferes with her physical functioning, (3) fatigue causes frequent problems for her, (4) fatigue prevents sustained physical functioning, (5) fatigue interferes with carrying out certain duties and responsibilities, (6) fatigue is among her three most disabling symptoms, and (7) fatigue interferes with her work, family, or social life. (*Id*.) On the ESS, Reeves evaluated her daytime sleepiness, indicating a "high chance of dozing" while sitting and reading, watching television, sitting inactive in a public place, sitting as a passenger in a car for an hour without a break, lying down to rest in the afternoon, sitting and talking to someone, and sitting quietly after lunch. (Tr. 413.) She indicated a moderate to high chance of dozing while "in a car, while stopped in traffic." (*Id*.) Reeves completed these same forms again in June 2015, and provided similar responses. (Tr. 414-415.)

On June 19, 2015, Reeves returned to Dr. Given. (Tr. 408-411.) She reported persistent family stressors, but indicated her narcolepsy was under "better control" and her sleep was

improved with medication. (*Id.*) On examination, Dr. Given noted Reeves had a flat affect and yawned constantly. (Tr. 410.) He continued her on her medications.[3] (*Id.*)

On July 7, 2015, licensed professional clinical counselor Mollie Royce, LLPC, completed a Mental Status Questionnaire regarding Reeves' mental functional limitations. (Tr. 418-420.) Ms. Royce indicated she had treated Reeves since December 12, 2012, and last seen her on April 22, 2015.[4] (Tr. 418.) She stated Reeves' speech was "very tangential and rambling" and her "thoughts were incomplete." (*Id.*) Ms. Royce further stated Reeves was oriented to person, place and time with a depressed mood, flat affect, "very poor" concentration, poor memory, and a good range of intelligence. (*Id.*) She stated Reeves had poor insight and judgment, which was "significantly improved when taking medication." (*Id.*) Ms. Royce also noted Reeves presented with significant anxiety." (*Id.*)

With regard to her mental functional limitations, Ms. Royce opined as follows:

**Please describe this patient's ability to:**

**a. Remember, understand, and following directions**: Very poor. She presented with significant difficulty with memory and following directions.

**b. Maintain attention**: Very difficult for her.

_____

[3] Several days later, Dr. Given sent a letter to Reeves' attorneys in response to the denial of Reeves' disability application. (Tr. 447.) He stated as follows: "I am sorry to read that my 'statements regarding [her] condition were not supported by the preponderance of file evidence, and therefore it [my statements] were not given much weight.' I would be curious as to the sources and nature of the 'file evidence.' Of particular interest to me would be the results of neuropsychological testing and in-depth consultation by a qualified clinician who is operating free of conflicting interests." (*Id.*)

[4] The parties do not direct this Court's attention to any treatment notes from Ms. Royce in the administrative record.

**c. Sustain concentration, persist at tasks, and complete them in a timely fashion**: Very difficult. She frequently drifted and seemed to fall asleep.

**d. Describe any deficiencies in . . . social interaction**: Very poor due to tiredness and difficulty staying awake. * * *

**e. How would the patient react to pressures, in work settings or elsewhere, involving in simple, routine or repetitive tasks?** Very poorly. She was working when she began therapy but quit due to inability to perform job tasks and keep up with job responsibility.

(Tr. 419.) On that same date, Ms. Royce completed a Daily Activities Questionnaire. (Tr. 421-422.) When asked to give examples of anything that might prevent work activity, Ms. Royce indicated Reeves had a high need for rest, fell asleep easily, and was "unable to drive sometimes." (Tr. 421.) She further stated Reeves was unable to do household chores, and had a very difficult time preparing food and driving. (Tr. 422.) Finally, Ms. Royce noted Reeves' progress in cognitive behavioral therapy was poor "due to difficulty with concentration and flight of thoughts and ideas." (*Id.*)

Reeves returned to Dr. Given's office on July 22, 2015. (Tr. 445-446.) She reported "good control of narcolepsy symptoms" and "satisfactorily improved" sleep issues. (*Id.*) On August 20, 2015 and September 16, 2015, Reeves reported her narcolepsy was under "better control" and her sleep was improved with medication. (Tr. 441-442, 438-439.) On both occasions, Dr. Given noted a flat affect and frequent yawning. (Tr. 440, 443.)

On October 29, 2015, Reeves reported feeling "weak and foggy last week." (Tr. 435.) She indicated her insomnia was persistent and she was not satisfied with her sleep quality. (*Id.*) Reeves also stated she had difficulty falling and staying asleep, did not feel refreshed upon waking, experienced early morning awakenings and daytime sleepiness, and was depressed and anxious. (*Id.*) On examination, Dr. Given noted Reeves' affect was groggy. (Tr. 437.) He

ordered blood work and continued her on her medications.  (*Id*.)  The following month, Reeves reported she was satisfied with her narcolepsy treatment although she was "still foggy 'from time to time.'" (Tr. 431.)  Examination findings were normal.  (Tr. 432.)

On December 17, 2015, Reeves presented to primary care physician Jennifer Watson, M.D., for treatment of her "thyroid issues" after losing a significant amount of weight.  (Tr. 456-461.)  Examination findings were normal, including normal gait, coordination, mood, memory, affect and judgment.  (Tr. 458.)  Dr. Watson continued Reeves on her thyroid medication and ordered additional blood work.  (*Id*.)

On December 28, 2015, Reeves returned to Dr. Given. (Tr. 428-430.)  She indicated her insomnia was controlled and her daytime sleepiness was "mostly controlled" by Adderall.  (Tr. 428.)  Reeves also reported she was satisfied with her sleep quality.  (*Id*.)  Physical examination findings were normal.  (Tr. 429.)

Reeves returned to Dr. Given and/or his nurse on four occasions in 2016.  On June 9, 2016, Reeves indicated her insomnia was "controlled."  (Tr. 425.)  Examination findings were normal.  (Tr. 427.)  In July 2016, Reeves again indicated her insomnia was controlled.  (Tr. 466.)  In August 2016, Reeves reported her insomnia was "better."  (Tr. 469.)  She stated her narcolepsy was persistent, indicating she still required a power nap daily.  (*Id*.)  In September 2016, Reeves indicated she was "about the same."  (Tr. 472.)  She stated she no longer experienced difficulty falling asleep with medication, but indicated she still required a power nap daily due to her narcolepsy.  (Tr. 472.)

On December 29, 2016, Dr. Given completed another Residual Functional Capacity Questionnaire.  (Tr. 476-477.)  He found Reeves could perform simple, routine, and repetitive

tasks with no strict production requirements in a low stress setting with little changes to her work environment. (*Id.*) Dr. Given further concluded Reeves would require extra reminders or assistance to properly perform work tasks, and would likely be absent from work more than four days per month as a result of her impairments or treatment. (*Id.*) He opined Reeves' condition would severely affect her concentration, persistence, or pace at work for more than 20% of the workday. (*Id.*) Dr. Given assessed Reeves was not capable of (1) work involving confrontation, arbitration, or negotiation; (2) handling strict time limits for completing tasks; (3) being responsible for the health, safety, or welfare of others; (4) supervising or managing others; (5) influencing others; or (6) traveling, driving, or delivering for work. (*Id.*) Finally, Dr. Given found Reeves' narcolepsy was medically equivalent to the severity of non-convulsive epilepsy, explaining "uncontrollable sleepiness occurs throughout the day, creates the same impairment as that of uncontrolled epilepsy." (*Id.*)

On that same date, Dr. Given drafted a "Letter for Disability" regarding Reeves' narcolepsy. (Tr. 480.) He confirmed Reeves' narcolepsy diagnosis, indicating "other medical causes have been excluded in her case." (*Id.*) Dr. Given further stated as follows:

> Her case is a very sad one. In terms of disability, I would consider her permanently unable to engage in remunerative employment. As a physician with Board Certification by the American Board of Medical Specialties, I have diagnosed and managed over 100 patients with Narcolepsy. She is one of the most severely sleepy and cognitively impaired patients I have encountered. She has improved but only slightly despite good compliance with several approved treatments.

(*Id.*)

**C.      State Agency Reports**

      **1.      Physical Impairments**

On June 1, 2015, state agency physician Teresita Cruz, M.D., reviewed Reeves' medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment. (Tr. 81-83.) Dr. Cruz found Reeves had no exertional or manipulative limitations. (*Id.*) She concluded Reeves had an unlimited capacity to balance, stoop, kneel, crouch, crawl, and climb ramps/stairs; but could never climb ladders, ropes, or scaffolds. (*Id.*) Finally, Dr. Cruz opined Reeves should avoid all exposure to hazards, such as machinery, heights, etc. (*Id.*)

On July 26, 2015, state agency physician Linda Hall, M.D., reviewed Reeves' medical records and completed a Physical RFC Assessment. (Tr. 96-98.) Dr. Hall reached the same conclusions as Dr. Cruz. (*Id.*) With regard to Reeves' restriction against exposure to hazards, Dr. Hall noted in particular that Reeves should not be exposed to unprotected heights or hazardous machinery, and should not engage in commercial driving. (*Id.*)

### 2. Mental Impairments

On May 5, 2015, Reeves underwent a psychological consultative examination with William Mohler, M.A. (Tr. 392-396.) She reported suffering from narcolepsy and thyroid problems, and indicated she was taking Adderall, Alprazolam, Synthroid, and Zantac. (Tr. 393.) Reeves stated she did not feel she suffered from depression or anxiety, although she stated she occasionally felt stressed. (Tr. 393-394.) On examination, Mr. Mohler noted Reeves was cooperative with adequate eye contact. (Tr. 394.) He found no abnormalities in her speech or language in terms of rate, volume, quantity, or articulation; however, he noted Reeves "had the most severe case of rambling speech I have ever identified." (*Id.*) Mr. Mohler explained Reeves was "excessively verbal," "rambled excessively," and would "continue on almost indefinitely with irrelevant and unneeded tangents." (*Id.*)

13

Mr. Mohler further found Reeves' affect was "appropriate to her mood which was cooperative and to some degree friendly," with no signs of anxiety or depression during the examination. (*Id.*) He noted she was alert and oriented and that, although she reported memory problems, "her memory screening was well above average for an individual her age." (*Id.*) Reeves' concentration and persistence were both adequate and she did not appear to have problems with attention span or distractibility. (*Id.*) Mr. Mohler noted her ability to carry out arithmetic calculations mentally was in the normal range, as she was able to handle addition, subtraction, multiplication, and division. (*Id.*) He concluded Reeves had "low-normal" insight and judgment, and was functioning in the low-normal to normal range in terms of intellectual abilities. (Tr. 394-395.)

Mr. Mohler stated "the only diagnosis given is narcolepsy by history." (Tr. 395.) He indicated "there is no evidence for any psychiatric disorders involving anxiety, depression or any psychotic symptoms," but found there was a "quality" to Reeves' excessive, rambling speech that "suggests the possibility at least of a neurological involvement beyond narcolepsy." (*Id.*) In terms of the four broad functional areas, Mr. Mohler opined as follows:

> **Describe the claimant's abilities and limitations in understanding, remembering and carrying out instructions**: Her low-normal to normal intellectual skills and above-average memory skills suggest that her ability to understand, remember and carry out instructions would be fairly typical of individuals with average intellectual functioning.
>
> **Describe the claimant's abilities and limitations in maintaining attention, concentration and maintaining persistence and pace to perform simple tasks to perform multi-step tasks**: She does not appear to have problems with attention span or distractibility. There is no evidence suggesting she would have difficulty maintaining persistence and pace to perform simple tasks or multistep tasks. This, however, would change if the task involved verbalizations as she would go on fairly endlessly in unrelated details and facts.

**Describe the claimant's abilities and limitations in responding appropriately to supervision and coworkers in the work setting:** Her rambling verbalizations would become irritable and problematic in dealing with supervisors and coworkers.

**Describe the claimant's abilities and limitations in responding appropriately to work pressures**: There is no apparent anxiety or depression to interfere with her ability to deal with work-related stressors.

(Tr. 395-396.)

On May 27, 2015, state agency psychologist Irma Johnston, Psy.D. reviewed Reeves' medical records and completed a Psychiatric Review Technique ("PRT"). (Tr. 79-80.) Dr. Johnston concluded there were "no mental medically determinable impairments established." (*Id.*) State agency psychologist Kristen Haskins, Psy.D., reviewed Reeves' medical records on reconsideration and completed a PRT on July 24, 2015. (Tr. 94.) Like Dr. Johnston, she found no evidence of a severe mental medically determinable impairment. (*Id.*)

**D.     Hearing Testimony**

During the January 12, 2017 hearing, Reeves testified to the following:

- She graduated from high school. (Tr. 29.) She also completed nursing school and trained to be a registered nurse ("RN"). (*Id.*) She has previous work experience as an RN and Medicare coding specialist. (Tr. 32-46.) She has not worked since September 2013. (Tr. 30.)

- She lives with her twenty-three (23) year old daughter in a house. (Tr. 28.) She has a driver's license but only drives "limited amounts," depending on how alert she feels. (*Id.*) She "won't drive if [she] doesn't feel alert enough to drive." (Tr. 29.) The longest she has driven is 30 minutes. (*Id.*) Her daughter drives the majority of the time. (Tr. 54.)

- She suffers from narcolepsy and cataplexy. (Tr. 30, 43-49.) She was formally diagnosed with narcolepsy in 2011 but experienced symptoms before then, including exhaustion, "drawing a blank," sudden onset of fatigue, and difficulty concentrating. (Tr. 43-44, 46-48.) She takes Adderall for her narcolepsy. (Tr. 47-48.) It does not eliminate all her symptoms but it keeps her alert enough that she can "at least get up" and move around. (Tr. 48.)

- As a result of her cataplexy, her arms and legs will suddenly feel like they weigh "a thousand pounds." (Tr. 49.) Her cataplexy spells can last from a couple minutes to a couple hours. (Tr. 50.) She also experiences unpredictable "micro-sleeps," which are like mini-seizures where she "zones out" for a few minutes. (Tr. 49.)

- She lost or resigned from several jobs due to her narcolepsy symptoms. (Tr. 30-31, 43-45.) At one job, her co-workers tried to accommodate her by letting her clock out, take a "power nap" in her car, and then clock back in. (Tr. 30-31.) Ultimately, she left the job because she just could not complete her work due to her symptoms. (*Id*.) In addition to feeling exhausted, she was not able to finish her work fast enough. (Tr. 45-46.)

- On a typical day, she "walks around a bit" and "sits on the floor a lot." (Tr. 51.) She takes a prolonged nap during the day, as well as several smaller naps. (Tr. 60.) "Most of the day is spent trying to get through the day." (Tr. 51.) She does some household chores but "keeps it simple." (Tr. 52-53.) She will occasionally run out to CVS or the grocery store. (*Id*.) She has a dog and six cats. (Tr. 52-54.) She helps scoop out the litter box and her daughter grooms them and takes them to the vet. (Tr. 54, 58-59.)

The VE testified Reeves had past work as a registered nurse (medium but performed as heavy, skilled, SVP 7) and coding specialist (sedentary but performed as light, skilled, SVP 7.) (Tr. 63-64.) The ALJ then posed the following hypothetical question:

Assume a hypothetical individual of the Claimant's age and education with the past jobs you described. Further assume that the individual does not have exertional limitations but can never climb ladders, ropes, and scaffolds; must avoid moving mechanical parts and unprotected heights; and can perform no commercial driving.

(Tr. 65.) The VE testified the hypothetical individual would be able to perform Reeves' past work as registered nurse and coding specialist (both as generally and actually performed). (Tr. 65-66.) The VE further explained the hypothetical individual would also be able to perform other representative jobs in the economy, such as transporter of patients (medium, unskilled, SVP 2), dietary aide (medium, unskilled, SVP 2), cleaner in a hospital (medium, unskilled, SVP

16

2), information clerk (light, unskilled, SVP 2), mail clerk (light, unskilled, SVP 2), and office helper (light, unskilled, SVP 2). (Tr. 66.)

The ALJ then asked a second hypothetical that was the same as the first but with the additional limitation that the hypothetical individual was restricted to simple, repetitive tasks. (Tr. 66.) The VE testified the hypothetical individual would not be able to perform Reeves' past work, but would be able to perform the six previously identified jobs. (Tr. 67.)

The ALJ then asked the VE regarding employer tolerance for off-task time and absences. (Tr. 67.) The VE testified that, to remain competitively employable, an individual could be off-task no more than 10% of an eight-hour workday, in addition to regularly scheduled breaks. (*Id.*) The VE further testified an individual could be absent from work two days per month and remain employable. (*Id.*)

The ALJ then asked as follows:

Q:    And if I added to the hypothetical that the individual would have to take breaks  . . . . in addition to the regularly scheduled breaks during the day to nap, would that person be competitively employable?

A:    No, ma'am, I don't believe so.  That would be an accommodation, and that's from my experience.

Q:    Even if the breaks were within the 10 percent off-task limit?

A:    I guess if it's the regular breaks they get plus less than 10 percent of the time it could be allowable, but I also feel that if the employer knew about that and, and made allowances for that I think it's considered an accommodation.

(*Id.*)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by

17

reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-

(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Reeves was insured on her alleged disability onset date, September 27, 2013, and remained insured through December 31, 2018, her date last insured ("DLI.")  (Tr. 11.)  Therefore, in order to be entitled to POD and DIB, Reeves must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2018.

2.    The claimant has not engaged in substantial gainful activity since September 27, 2013, the alleged onset date (20 CFR 404.1571 *et seq*.)

3.    The claimant has the following severe impairments: narcolepsy and cataplexy (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526.)

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant can never climb ladders, ropes, or scaffolds.  She must avoid moving mechanical parts, unprotected heights, and commercial driving. The claimant is limited to simple, routine tasks.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on July ** 1963 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from September 27, 2013 through the date of this decision (20 CFR 404.1520(g)).

(Tr. 11-18.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v.*

*Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld

where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### *Treating Physician Dr. Given*

In her first assignment of error, Reeves argues the ALJ failed to assign appropriate weight to the opinions of her treating physician, Dr. Given. (Doc. No. 12 at 9-14.) She maintains Dr. Given's opinions should have been accorded "controlling weight" because they are well supported by clinical and laboratory techniques and not inconsistent with other evidence in the record. (*Id.* at 12.) Reeves further argues that, even if not accorded "controlling weight," the ALJ "still erred in her determination as to the appropriate weight to assign to his opinions under the factors in the regulations." (*Id.*) She asserts the ALJ failed to "utilize appropriate criteria" and, further, failed to provide "good reasons" for according little weight to Dr. Given's opinions. (*Id.* at 12-13.) In sum, Reeves argues the ALJ decision "disregards the

objective test results that establish her narcolepsy and cataplexy, ignores the fact that the

reviewing physicians found that the Plaintiff reported excessive fatigue and trouble

concentrating are reasonable symptoms and supported by the medical evidence,

and disregards the consulting opinion that the Plaintiff has possible neurologic involvement

with excessive rambling speech that would become irritable and problematic in dealing with

supervisors and coworkers." (*Id.* at 13-14.)

      The Commissioner argues the ALJ properly determined that Dr. Given's opinions were

not entitled to either controlling or great weight.  (Doc. No. 13 at 19.)  She maintains the ALJ

"accurately found that the objective medical evidence did not support the significant limitations

Dr. Given described," noting treatment records showing improvement with medication.  (*Id.* at

20.)  The Commissioner also notes that physical and mental status examinations were generally

unremarkable and Reeves only occasionally exhibited a flat or groggy affect.  (*Id.*)  Finally, the

Commissioner argues that, reading the decision as a whole, it is clear the ALJ addressed the

regulatory factors, including the length, frequency and duration of the treating relationship and

the consistency and supportability of Dr. Given's opinions.  (*Id.* at 21.)

      A treating source opinion must be given "controlling weight" if such opinion (1) "is

well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2)

"is not inconsistent with the other substantial evidence in [the] case record." *Gayheart v.*

*Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).[5]

However, "a finding that a treating source medical opinion . . . is inconsistent with the other

---

[5] Revised versions of these regulations took effect on March 27, 2017 and apply to
disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).

substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (quoting SSR 96-2p, 1996 WL 374188 at *4 (SSA July 2, 1996)).[6]  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[7]  *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.,* as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id*. § 404.1527(c)(2)-(6).")

    If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting SSR 96-2p, 1996 WL 374188 at *5).  *See also Gayheart*, 710 F.3d at 376.  The purpose of this requirement is two-fold.  First, a

---

[6] SSR 96-2p has been rescinded.  This rescission is effective for claims filed on or after March 27, 2017.  *See* SSR 96-2p, 2017 WL 3928298 at *1.

[7] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,'

particularly where a claimant knows that his physician has deemed him disabled and therefore

'might be bewildered when told by an administrative bureaucracy that she is not, unless some

reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378

F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the

treating physician rule and permits meaningful appellate review of the ALJ's application of the

rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth

Circuit has held that the failure to articulate "good reasons" for discounting a treating

physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the

ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical

data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d

431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581

F.3d at 406. The ALJ is not bound by conclusory statements of a treating physician that a

claimant is disabled, but may reject such determinations when good reasons are identified for

not accepting them. *See King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v.

Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745

F.2d 383, 391 (6th Cir. 1984). According to 20 C.F.R. § 404.1527(d)(1), the Social Security

Commissioner makes the determination whether a claimant meets the statutory definition of

disability. This necessarily includes a review of all the medical findings and other evidence that

support a medical source's statement that one is disabled. "A statement by a medical source

that you are 'disabled' or 'unable to work' does not mean that we will determine that you are

disabled." *Id.* It is the Commissioner who must make the final decision on the ultimate issue of

disability. *See Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667

F.2d 954, 958 n. 1 (11th Cir. 1982).

Here, Dr. Given authored several opinions regarding Reeves' functioning. On March

4, 2015, Dr. Given found Reeves' narcolepsy "impairs her ability to focus and concentrate

sufficiently to complete tasks" and "disables her from gainful employment." (Tr. 284-285.) He

further found that (1) Reeves was likely to be absent from work more than four days per month

as a result of her impairments or treatment; and (2) her condition would severely affect her

concentration, persistence, or pace at work for more than 20% of the workday. (*Id.*)

Subsequently, on December 29, 2016, Dr. Given completed an RFC Questionnaire in

which he found Reeves was limited to simple, routine, and repetitive tasks with no strict

production requirements in a low stress setting with little changes to her work environment.

(Tr. 476-477.) Dr. Given further concluded Reeves would require extra reminders or assistance

to properly perform work tasks, and would likely be absent from work more than four days per

month as a result of her impairments or treatment. (*Id.*) He also opined Reeves' condition

would severely affect her concentration, persistence, or pace at work for more than 20% of the

workday. (*Id.*) Dr. Given assessed she was not capable of (1) work involving confrontation,

arbitration, or negotiation; (2) handling strict time limits for completing tasks; (3) being

responsible for the health, safety, or welfare of others; (4) supervising or managing others; (5)

influencing others; or (6) traveling, driving, or delivering for work. (*Id.*)

Lastly, and on that same date, Dr. Given drafted a "Letter for Disability" regarding

Reeves' narcolepsy. (Tr. 480.) He confirmed Reeves' narcolepsy diagnosis, indicating "other

medical causes have been excluded in her case." (*Id.*) Dr. Given stated that he "would consider her permanently unable to engage in remunerative employment," noting Reeves "is one of the most severely sleepy and cognitively impaired patients I have encountered [and] has improved but only slightly despite good compliance with several approved treatments." (*Id.*)

The ALJ addressed Dr. Given's treatment of Reeves and his opinions regarding her physical and mental functional limitations, as follows:

> The claimant has a complicated medical history of narcolepsy, cataplexy, and mild obstructive sleep apnea. An overnight sleep study administered on July 25, 2012, confirmed only mild OSA. However, it also confirmed restless leg syndrome, difficult sleep initiation, difficulty maintaining sleep, and severe fragmentation of sleep.(Exhibit 1F3-11.) Furthermore, a recent multiple sleep latency test demonstrated several positive findings consistent with a diagnosis of narcolepsy. (Exhibit 14F) Despite her severe impairments and some ongoing fatigue and difficulty sleeping, the alleged severity, frequency, and intensity of her other alleged symptoms -- including muscle weakness/heavy limbs, micro-sleeps, and seizure-like activity are not supported by the objective medical evidence.

> Medical records in the file demonstrate consistent and ongoing treatment with allergist and sleep specialist Dr. John Given since at least September 2013. Progress notes from Dr. Given reliably report compliance with medication -- currently Xanax and Adderall. At her appointments with Dr. Given, the claimant consistently reports either improved sleep or satisfaction with sleep. On February 18, 2015, Dr. Given noted that the claimant's condition had been responding positively to treatment but that due to recent environmental stressors -- unemployment, divorce, ex-husband's imprisonment -- the claimant's condition had deteriorated. He also indicated that the claimant had "a very good chance of returning to full-time employment" but was in need of additional temporary help. There is no objective medical evidence to support a finding that the claimant's temporarily impaired condition on this day remained the same. Furthermore, there is no evidence that Dr. Given has observed any of the claimant's micro-sleeps or seizure-like activity -- despite the alleged frequency of these symptoms. Nor is there objective medical findings to confirm the claimant's allegations of heavy limbs and severe muscle weakness. (Exhibits 3F-6F, 8F, 10F, and 12F)

> Dr. Given has submitted several medical source statements to this Agency opining several things. He has opined that the claimant's medical condition disables her from all gainful employment. He has also opined that if employed, the claimant would miss up to 4 days of work each month or be off-task up to 20% of the workday

due treatment and symptom severity. He has opined that she is unable to focus and concentrate sufficiently to perform the tasks of her previous job. He recently opined that in addition to the other limitations, she cannot work in an environment with strict production quotas, she cannot handle more than a few workplace changes, she is limited to simple, routine, and repetitive tasks, and she cannot engage in confrontation, arbitration, or negotiation. (Exhibits 4F2-5 and 13F)

Despite Dr. Given's status as a treating source, his opinions are not given controlling weight, or even great weight, for the following reasons. First a finding that an individual is "disabled" or "unable to work," is an administrative finding and is an issue reserved to the Commissioner (20 CFR 404.1527(e)(l) and 416.927(e)(l)). Medical opinions on these issues must not be disregarded; but cannot be entitled to controlling weight or even given special significance, even when offered by a treating source (SSR 96-Sp). Second, the objective medical evidence does not support the significant limitations he has described.

(Tr. 14-15.) The ALJ then discussed the opinions of consultative examiner Dr. Mohler, therapist Mollie Royce, and state agency physicians Drs. Cruz, Hall, Johnston, and Haskins. (Tr. 15-16.) The ALJ assigned "little weight" to Ms. Royce's opinion and "great weight" to the state agency medical assessments. (*Id*.)

The ALJ assessed the following RFC: "After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant can never climb ladders, ropes, or scaffolds. She must avoid moving mechanical parts, unprotected heights, and commercial driving. The claimant is limited to simple, routine tasks." (Tr. 14.)

In determining whether the ALJ properly evaluated Dr. Given's opinions, the Court first notes that the ALJ's RFC did, in fact, adopt Dr. Given's opinions that Reeves was limited to simple, routine tasks, and could not engage in commercial driving. (Tr. 14.) However, the ALJ rejected all of Dr. Given's remaining opinions, including his assessment that Reeves (1)

was likely to be absent from work more than four days per month as a result of her impairment; (2) would be severely affected for more than 20% of the workday with respect to her concentration, persistence, or pace; (3) was limited to repetitive tasks with no strict production requirements in a low stress setting with little changes to her work environment; and (4) would require extra reminders or assistance to properly perform work tasks. The ALJ also implicitly rejected Dr. Given's assessment that Reeves was not capable of work involving confrontation, arbitration, or negotiation; handling strict time limits for completing tasks; being responsible for the health, safety, or welfare of others; and supervising, managing, or influencing others.

For the following reasons, the Court finds the ALJ did not err in assigning less than controlling weight to Dr. Given's opinions. As an initial matter, the ALJ did not err in rejecting Dr. Given's opinions that Reeves was "disabled from gainful employment" and "permanently unable to engage in remunerative employment." (Tr. 284-285, 480.) As noted above, an ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled. *See King*, 742 F.2d at 973; *Duncan*, 801 F.2d at 855; *Garner*, 745 F.2d at 391. *See also* 20 C.F.R. § 404.1527(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled.") Rather, it is well-established that it is the Commissioner (and not a treating physician) who must make the final decision on the ultimate issue of disability. *See Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435. Thus, the ALJ did not err in rejecting Dr. Given's broad conclusions that Reeves was "disabled" under social security regulations.

With regard to Dr. Given's more specific proposed limitations, the Court finds the ALJ properly determined Dr. Given's opinions were not entitled to controlling weight and, further,

that she provided "good reasons" for rejecting them. The ALJ rejected these limitations on the grounds that "the objective medical evidence does not support the significant limitations [Dr. Given] has described." (Tr. 15.) While it would be questionable whether this statement, taken alone, would be sufficient to satisfy the "good reasons" requirement of the treating physician rule, the Court notes that, just prior to evaluating Dr. Given's opinion, the ALJ thoroughly discussed the medical evidence regarding Reeves' narcolepsy and cataplexy, as well as her treatment for these conditions with Dr. Given. (Tr. 14-15.) As set forth above, the ALJ discussed the results of Reeves' July 2012 polysomnogram and MSLT, as well as her diagnosis with narcolepsy and repeated complaints of fatigue, heavy limbs, micro-sleeps, muscle weakness, depression, and seizure like activity. (*Id.*) The ALJ acknowledged Reeves' "consistent and ongoing" treatment with Dr. Given since at least September 2013. (Tr. 15.) She emphasized that Dr. Given's treatment notes indicated Reeves responded positively to treatment and, further, that Reeves consistently reported either improved sleep or satisfaction with sleep. (*Id.*) The ALJ also noted the lack of medical evidence to confirm Reeves' allegations of heavy limbs and severe muscle weakness, as well as the fact that Dr. Given had not observed any of Reeves' micro-sleeps or seizure-like activity "despite the alleged frequency of these symptoms." (*Id.*)

    In providing the above discussion, the ALJ implicitly addressed the consistency and supportability of Dr. Given's opinions, in particular the fact that his assessment of extreme limitations was inconsistent with Reeves' positive response to treatment and reports of improved sleep. The ALJ also addressed several other regulatory factors at step four, including the length, nature, and extent of Dr. Given's treatment relationship with Reeves, the frequency

of his examinations, and Dr. Given's specialization as an allergist and sleep specialist. (*Id.*) In light of the above, and reading the decision as a whole, the Court finds theALJ's discussion of Reeves' narcolepsy and cataplexy provides a sufficient basis for the ALJ's decision to accord less than controlling or great weight to Dr. Given's opinion. *See e.g., Nelson v. Comm'r of Soc. Sec.*, 195 Fed. Appx. 462, 470-471 (6th Cir. 2006); *White v. Berryhill*, 2017 WL 1091580 at * 18 (N.D. Ohio March 1, 2017)*; Ellis v. Comm'r of Soc. Sec.*, 2015 WL 6444319 at * 15-16 (N.D. Ohio Oct. 23, 2015).

The Court further finds the ALJ's reasons for discounting Dr. Given's opinion are supported by substantial evidence. As the ALJ correctly noted, Reeves consistently reported that her narcolepsy and sleep issues were improved with medication and treatment. In October 2013, Reeves was optimistic due to improvement of her fatigue and daytime sleepiness with medication. (Tr. 253.) The following month, she reported "I feel so much better on the short acting Adderall." (Tr. 261.) Throughout 2014, Reeves indicated her narcolepsy was under "better control" and her sleep was improved on medication. (Tr. 265, 272, 275-276, 303, 306-307, 309, 311, 314, 317.) Physical examination findings during this time period were largely normal. Reeves continued to overall improvement in 2015. In January, March, April, May, June, July, August and September 2015, Reeves reported her narcolepsy and daytime sleepiness were improved and her sleep was improved with medication. (Tr. 320, 323, 334-335, 400-401, 404-405,408-411, 445-446, 441-442, 438-439.) While Reeves reported an exacerbation of her symptoms in October 2015, she reported to Dr. Given in December 2015 that her insomnia was controlled, her daytime sleepiness was "mostly controlled," and she was satisfied with her sleep quality. (Tr. 428-430.) Treatment notes reflect Reeves' condition remain unchanged in visits

during June, July, August and September 2016. (Tr. 425, 466, 469, 472.) Aside from occasional findings of flat or groggy affect, Reeves' examination findings were largely normal during this time period. Moreover, as the ALJ correctly notes, Reeves does not direct this Court's attention to any objective medical findings documenting her allegations of severe muscle weakness and/or heavy limbs.

As noted above, the ALJ discussed this evidence at step four, just prior to evaluating Dr. Given's opinions. Had the ALJ discussed this evidence immediately after stating that she was rejecting Dr. Given's assessment of significant functional limitations, there would be no question that the ALJ provided "good reasons" for rejecting Dr. Given's opinion. The fact that the ALJ did not analyze the medical evidence for a second time (or refer to her previous analysis) when rejecting the opinion does not necessitate remand of Reeves' case. "No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Shkabari v. Gonzales*, 427 F.3d 324, 328 (6th Cir.2005) (quoting *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir.1989)). *See also Kobetic v. Comm'r of Soc. Sec*., 114 Fed. Appx. 171, 173 (6th Cir.2004) (When "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game.") (quoting *NLRB v. Wyman–Gordon Co.*, 394 U.S. 759, 766, n.6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969)); *Ellis*, 2015 WL 6444319 at * 16 (same).

Accordingly, Reeves' first assignment of error is without merit.

***Step Three***

In her second assignment of error, Reeves argues the ALJ improperly evaluated her narcolepsy at step three of the sequential evaluation. (Doc. No. 12 at 14-17.) Noting that narcolepsy and cataplexy are not listed impairments, Reeves argues the ALJ "cited to the closest appropriate listing section, 11.00, Neurologic Disorders [but] did not perform any analysis under this listing or address the medical evidence that reported that an equivalency existed." (*Id*. at 15.) Reeves emphasizes that Dr. Given found her narcolepsy was medically equivalent in severity to Listing 11.03 because her uncontrollable sleepiness occurs throughout the day and creates the same impairment as that of uncontrolled epilepsy. (*Id.*) She maintains "the ALJ's failure to solicit medical expert testimony and to fully articulate her reasoning regarding listing equivalency deprives this Court of the ability to conduct any meaningful review." (*Id.*)

The Commissioner argues the ALJ properly found that Reeves does not meet or equal a listing. (Doc. No. 13 at 13-18.) She maintains Reeves "has failed to articulate how the medical evidence relating to her narcolepsy and cataplexy 'is at least of equal medical significance' to" the requirements of Listing 11.03. (*Id*. at 15.) In particular, the Commissioner argues Reeves "fails to offer any meaningful argument demonstrating her specific symptoms, treatment records/history, and objective test results rest in a finding of medical equivalence to Listing 11.03." (*Id.* at 16.) The Commissioner further asserts Dr. Given's opinion does not justify a remand because it is inconsistent with Reeves' treatment records, which documented improvement with treatment and medication and did not contain any driving restrictions. (*Id*. at 17.) Finally, the Commissioner argues the ALJ was not required to obtain the opinion of a

medical expert because both Drs. Cruz and Hall specifically opined that Reeves did not meet or equal a listing.  (*Id*. at 17-18.)

At the third step in the disability evaluation process, a claimant will be found disabled if her impairment meets or equals one of the Listing of Impairments.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 Fed. Appx. 488, 491 (6th Cir. 2010).  The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. §§ 404.1525(a), 416.925(a).  Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing."  20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3).  It is the claimant's burden to bring forth evidence to establish that her impairments meet or are medically equivalent to a listed impairment.  *See e.g. Lett v. Colvin*, 2015 WL 853425 at * 15 (N.D. Ohio Feb. 26, 2015).  A claimant must satisfy all of the criteria to "meet" the listing.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009).  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 521, 107 L.Ed.2d 967 (1990).  A claimant is also disabled if her impairment is the medical equivalent of a listing, 20 C.F.R. §§ 404.1525(c)(5), 416.925(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment."  20 C.F.R. §§ 404.1526(a), 416.926(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment. *See Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 414-15 (6th Cir. 2011). In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for his decision. *Id.* at 416-17.

Here, at step two, the ALJ determined Reeves suffered from the severe impairments of narcolepsy and cataplexy. (Tr. 13.) At step three, she determined Reeves' impairments did not meet or medically equal the requirements of a Listing, explaining as follows:

> No treating or examining physician has indicated findings that would satisfy the severity requirements of any listed impairment. In reaching the conclusion that the claimant does not have an impairment or combination of impairments that meet or medically equal a listed impairment, I also considered the opinion of the State Agency medical consultants who evaluated this issue at the initial and reconsideration levels of the administrative review process and reached the same conclusion (20 CFR 404.1527(f), 416.927(f) and Social Security Ruling 96-6p). There is no Listing for narcolepsy or cataplexy. However, I have specifically considered whether the claimant's impairments equal any of the neurological listings in Section 11.00.

(Tr. 13-14.)

Reeves asserts remand is required because the ALJ failed to sufficiently evaluate whether her narcolepsy and cataplexy medically equal the requirements of Listing 11.03 for non-convulsive epilepsy. Medical equivalence can be found in three ways: (1) the claimant has a listed impairment but does not exhibit the specified severity or findings, yet has "other findings" that are "at least of equal medical significance" to the criteria; (2) the claimant has a non-listed impairment that is "at least of equal medical significance" to a listed impairment; or (3) the claimant has a combination of impairments which do not individually meet a Listed

Impairment, but are "at least of equal medical significance" to a listing when viewed in totality.

20 C.F.R. § 404.1526. *See also Reynolds*, 424 Fed. Appx. at 415; *Moran v. Comm'r of Soc.*

*Sec.*, 40 F.Supp.3d 896, 922 (E. D. Mich 2014); *Postma v. Astrue*, 2012 WL 3912887 at * 6

(N.D. Ohio June 22, 2012), *report and recommendation adopted by* 2012 WL 3912858 (N.D.

Ohio Sept. 7, 2012). In the instant case, Reeves appears to argue medical equivalence under the

second of these circumstances; i.e., that her non-listed impairments of narcolepsy and cataplexy

are "at least of equal medical significance" to the requirements of Listing 11.03.

The Social Security Administration ("SSA") has defined narcolepsy as follows:

Narcolepsy is a chronic neurological disorder characterized by recurrent periods of an irresistible urge to sleep accompanied by three accessory events:

1.    Cataplexy—attacks of loss of muscle tone, sometimes with actual collapse, during which the individual always remains conscious.

2.    Hypnagogic hallucinations—hallucinations which occur between sleep and wakening.

3.    Sleep paralysis—a transient sensation of being unable to move while drifting into sleep or upon awakening. In addition, some persons have periods of automatic behavior and most have disturbed nocturnal sleep.

*See* POMS DI 24580.005 ("Evaluation of Narcolepsy) (eff. 9/26/16 - present). The SSA further

explains as follows:

Although narcolepsy and epilepsy are not truly comparable illnesses, when evaluating medical severity, the closest listing to equate narcolepsy with is Listing 11.02, Epilepsy.

The severity of narcolepsy should be evaluated after a period of 3 months of prescribed treatment. It is not necessary to obtain an electroencephalogram (EEG) in narcolepsy cases. A routine EEG is usually normal, and when special attempts are made to obtain abnormal rapid eye movement (REM) sleep patterns, they may or may not be present even in true cases of narcolepsy. Also, narcolepsy is not usually treated with anticonvulsant medication, but is most frequently treated by the use of drugs such as stimulants and mood elevators for

which there are no universal laboratory blood level determinations available. Finally, it is important to obtain from an ongoing treatment source a description of the medications used and the response to the medication, as well as an adequate description of the claimant's alleged narcoleptic attacks and any other secondary events such as cataplexy, hypnagogic hallucinations or sleep paralysis.

*Id*. At the time of the ALJ decision, Listing 11.03 provided as follows:

**11.03 Epilepsy—nonconvulsive epilepsy (petit mal, psychomotor, or focal),** documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 11.03 (amended Sept. 29, 2016). *See also Ison v. Acting Comm'r of Soc. Sec.*, 2017 WL 4124586 at * 7 (S.D. Ohio Sept. 18, 2017).

For the following reasons, the Court finds remand is not required. Although the ALJ's step three discussion is brief, the ALJ specifically stated that she considered whether Reeves' narcolepsy and/or cataplexy medically equaled any of the neurological listings in Section 11.00, which necessarily includes Listing 11.03. (Tr. 14.) Certainly, it would have been preferable for the ALJ to thoroughly discuss her analysis of the medical evidence regarding these conditions in the context of her step three analysis. However, the Sixth Circuit has found that, even where an ALJ's step three analysis is insufficient, remand is not required where the error is harmless. *See e.g., Forrest v. Comm'r of Soc. Sec.*, 591 Fed. Appx. 359, 364-366 (6th Cir. Nov. 17, 2014); *Burbridge v. Comm'r of Soc. Sec.*, 572 Fed. Appx. 412, 417 (6th Cir. July 15, 2014); *Bledsoe v. Barnhart*, 165 Fed. Appx. 408, 411 (6th Cir. Jan. 31, 2006). *See also Ison*, 2017 WL 4124586 at * 5-6; *Cygan v. Comm'r of Soc. Sec.*, 2016 WL 1128087 at * 2-3 (E.D. Mich. March 23, 2016); *Vidot v. Colvin*, 2015 WL 3824360 at * 5-7 (N.D. Ohio June 18, 2015); *Wilson v. Colvin*, 2015 WL 1396736 at * 3-4 (E.D. Tenn. March 26, 2015). Specifically, a court may find an ALJ's

failure to adequately discuss whether a claimant meets or medically equals the specific requirements of a Listing to be harmless error when "the ALJ made sufficient factual findings elsewhere in his decision to support his conclusion at step three." *Forrest*, 591 Fed. Appx. at 366. *See Bledsoe,* 165 Fed. Appx. at 411 (looking to findings elsewhere in the ALJ's decision to affirm a step-three medical equivalency determination, and finding no need to require the ALJ to "spell out every fact a second time"); *Burbridge*, 572 Fed.Appx. at 417 (acknowledging an ALJ's step-three analysis was "cursory" but suggesting that, under Sixth Circuit precedent, it is enough for the ALJ to support his findings by citing an exhibit where the exhibit contained substantial evidence to support his conclusion). *See also Ison*, 2017 WL 4124586 at * 5 (stating "this Court may review the entire administrative decision to determine whether the ALJ made sufficient factual findings to support his [step three] conclusion"); *Kerns v. Comm'r of Soc. Sec.*, 2017 WL 1324609 at *2-3 (S.D. Ohio April 11, 2017) (finding the ALJ supported its step three determination in her review of the medical evidence, extensive analysis conducted during the RFC assessment, and credibility determination).

Here, the ALJ thoroughly discussed the medical evidence regarding Reeves' narcolepsy and cataplexy at step four. As noted *supra*, the ALJ acknowledged Reeves' reports of fatigue, daytime sleepiness, insomnia, heavy limbs, and muscle weakness, and considered the results of her July 2012 polysomnogram and MSLT. (Tr. 14-15.) The ALJ explained, however, that Dr. Given's treatment records showed that Reeves responded positively to treatment and consistently reported that her narcolepsy, daytime sleepiness, and other sleep issues were controlled and/or improved with medication and treatment. (*Id*.) The ALJ also noted the absence of objective medical evidence confirming Reeves' allegations of heavy limbs and/or muscle weakness. (*Id*.)

As discussed at length above, the ALJ's findings are supported by substantial evidence in the record. Given the ALJ's thorough discussion of this evidence at step four, the Court finds the ALJ's failure to provide a more complete step three analysis to be harmless.

Reeves argues remand is nonetheless required because the ALJ failed to adequately consider Dr. Given's opinion that her narcolepsy medically equaled Listing 11.03. This argument is without merit. "While the testimony of a medical expert that a claimant's impairments meet or equal the listing can be substantial evidence to support the determination of the Commissioner, such testimony must be supported by adequate medical findings; a physician's mere conclusory statement will not be sufficient." *Casteel v. Astrue*, 2012 WL 5398537 at * 5 (W.D. Ky. Sept. 21, 2012) (citing *Atterberry v. Sec'y of HHS*, 871 F.2d 567, 570 (6th Cir.1989) and *King*, 742 F.2d at 973). Here, the Court has already determined, for the reasons set forth at length *supra*, that the ALJ properly discounted Dr. Given's opinions. Moreover, as the ALJ correctly notes, both state agency physicians (Drs. Cruz and Hall) specifically determined Reeves did not meet or medically the requirements of any listed impairment.[8] *See Ison*, 2017 WL 4124586 at * 8 (stating " the state agency medical examiner's

---

[8] In light of these state agency physician opinions, the Court rejects Reeves' suggestion the ALJ erred in failing to "solicit medical expert testimony" regarding the issue of medical equivalence. (Doc. No. 12 at 15.) While a medical expert's opinion "is required before a determination of medical equivalence is made," *Retka v. Comm'r of Soc. Sec.*, 1995 WL 697215 at *2 (6th Cir. 1995), the Sixth Circuit considers the signature of a state agency physician on a disability determination to be probative evidence that medical equivalence was considered. *See Hicks v. Comm'r of Soc. Sec.*, 105 Fed. Appx. 757, 762 (6th Cir. 2004), quoting SSR 96-6p, 1996 WL 374180 (July 2, 1996) ("The signature of a State agency medical or psychological consultant ... ensures that consideration by a physician (or psychologist) designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review.") *See also Ison*, 2017 WL 4124586 at * 8.

assessments provide substantial evidence that medical equivalence was considered but not found for Ison's conditions."). *See also Jones v. Astrue*, 2009 WL 2827942 at *12-13 (S.D. Ohio Sept. 1, 2009) (finding the ALJ properly relied on the medical opinions from the state agency medical examiners when determining medical equivalence.)

Lastly, the Court notes that, aside from citing generally to Dr. Given's opinions, Reeves fails to adequately articulate how the medical evidence relating to her narcolepsy and cataplexy is "at least of equal medical significance" to Listing 11.03. Indeed, Reeves fails to offer any meaningful argument demonstrating that her specific symptoms, treatment records, and objective test results result in a finding of medical equivalence to Listing 11.03. As noted above, it is the claimant's burden to bring forth evidence to establish that her impairments meet or are medically equivalent to a listed impairment. *See e.g. Lett*, 2015 WL 853425 at * 15. Here, Reeves has failed in her burden of proving that her narcolepsy and cataplexy are medically equivalent to the specific requirements of Listing 11.03. *See King*, 742 F.2d at 974; *White v. Comm'r of Soc. Sec.*, 2015 WL 1197818 at * 17 (S.D. Ohio March 16, 2015).

Accordingly, and for all the reasons set forth above, Reeves' second assignment of error is without merit.

## VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

 *s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: November 13, 2018